IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ASHLEY N. MYVETT a/k/a ASHLEY N. LIDDELL, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) 17 C 8711 ) ) Judge John Z. Lee ) |
| KRAFT HEINZ FOODS COMPANY, LLC, | ) ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ashley Myvett was fired in June 2017 from her position as in-store partner at Kraft Heinz Food Company ("Kraft Heinz"). She then filed this lawsuit, alleging that Kraft Heinz fired her because of her physical disability (Count I) and failed to reasonably accommodate her (Count II), both in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*. Kraft Heinz has moved for summary judgment [64] as to both of Myvett's claims. For the following reasons, that motion is granted in part and denied in part.

### Background[1]

Myvett is a former employee of Kraft Heinz, a marketer of food and beverage products that is a "covered" employer as defined by the ADA. Defs.' L.R. 56.1 Statement of Facts ("DSOF") ¶¶ 1, 2, ECF No. 66. In 2016, Kraft Heinz started

---

[1] The following facts are undisputed or have been deemed admitted, unless otherwise noted.

1

"Project LEGO" to increase purchases of its food and beverage products, including by using a new in-store sales team to execute merchandising and sales objectives. *Id.* ¶ 5.

Myvett began working full-time as an in-store partner ("ISP") in Kraft Heinz's LEGO division on January 17, 2017. *Id.* ¶ 8. ISPs are responsible for visiting and working with stores in a specifically assigned territory. *Id.* ¶ 9. Myvett was assigned to seventeen stores in the "Chicago South" territory. *Id.*

Myvett reported to Associate Manager Nhora Rodriguez. *Id.* ¶ 11. Starting in late March 2017, Rodriguez began reporting to Regional Manager Heath Harlem. *Id.* ¶ 12. Harlem in turn reported to Gabriel de Sousa, the Director of In-Store Sales and one of the leaders of the LEGO division. *Id.* ¶ 13. According to Harlem, during his first conversation with Rodriguez about Myvett in March 2017, Rodriguez told him that Myvett sometimes had a negative attitude and did not follow instructions. *Id.* ¶ 37.

On March 8, 2017, Myvett began a medical leave of absence relating to a surgical procedure. *Id.* ¶¶ 24–25. She returned to work on April 10, 2017. *Id.* ¶ 28. Her doctor's note, which she emailed to Kraft Heinz a few days before returning, stated that she could not lift more than ten pounds, and that she would need to stop and take breaks if she experienced pain while driving. *Id.* ¶ 27.

Late in the evening on May 24, 2017, Harlem learned of Myvett's lifting restriction. *Id.* ¶ 30. Within minutes, he emailed de Sousa, HR Group Lead Maria Aliberti, and HR Specialist Pearl Patel with the subject line "Ashley Liddell Myvett

2

Accommodation request." Def.'s Ex. A, Harlem Dep. Ex. 16 at 1, ECF No. 66-1. In the email, Harlem expressed concern about the lifting restriction, saying, *inter alia*, that there was "not an end in [sight]," that it would make "much of our merchandising impossible for her to complete," and asking, "how do we handle our merchandising commitments that we made our retail teams for her stores?" *Id.* Harlem ended the email by stating that "Ashley has been a problem ISP, with poor communication, and earlier this week committed a major offense." *Id.*

Roughly ten minutes later, Harlem sent another email to Pearl, Aliberti, and de Sousa detailing Myvett's failure to bring her iPad to work two days earlier and seeking to generate a warning letter. Harlem Dep. Ex. 21 at 2. As a result of these emails, Aliberti initiated an investigation into Myvett's performance, DSOF ¶ 53, and Patel sent Myvett paperwork so that she could formally request a reasonable accommodation, *id.* ¶ 31. Myvett did not fill out the forms. *Id.*

Aliberti's investigation eventually led to Myvett's termination on June 16, 2017. *Id.* ¶ 61. Her termination was a collective decision made by Harlem, Aliberti, and de Sousa, *id.* ¶ 63; Kraft Heinz asserts that they concluded that Myvett had suffered from performance and integrity deficiencies, including failing to spend sufficient time in her stores, having attitude problems, and artificially inflating her quarterly bonus. *Id.* ¶ 64. Myvett disputes the existence or severity of these deficiencies. *See, e.g.*, Resp. to DSOF ¶¶ 53–63, ECF No. 73.

Myvett subsequently brought this action under the ADA, alleging that Kraft Heinz wrongfully terminated her on the basis of her disability (Count I) and failed

3

to reasonably accommodate her (Count II). *See* Compl., ECF No. 8. Kraft Heinz moves for summary judgment as to both claims. *See* Mot. for Summ. J., ECF No. 64; Mem. in Supp. of Summ. J, ECF No. 65.

## **Legal Standard**

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). The Court must not make credibility determinations or weigh conflicting evidence. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2013).

## **Analysis**

### I. **Local Rule 56.1**

Under Local Rule 56.1, "a non-movant seeking to assert facts that go beyond what is fairly responsive to the movant's Local Rule 56.1(a)(3) assertions must do

4

so not in [their] Local Rule 56.1(b)(3)(B) response, but rather in a Local Rule 56.1(b)(3)(C) statement of additional facts." *Buford v. Laborers' Int'l Union Local 269*, No. 16 C 10218, 2019 WL 184052, at *3 (N.D. Ill. Jan. 14, 2019); *see Eason v. Nolan*, 416 F. App'x 569, 570 (7th Cir. 2011) ("[T]he district court did not abuse its discretion when it disregarded the additional facts that [the non-movant] included in his [Local Rule 56.1(b)(3)(B) response."]).

Myvett's responses to Kraft Heinz's Local Rule 56.1(a)(3) statement of facts often contain additional facts that were not properly included with her Local Rule 56.1(b)(3)(C) statement of additional facts. *See* Resp. to DSOF; Pl.'s Rule 56.1 Statement of Additional Facts ("PSOAF"), ECF No. 74. Those additional factual statements have been disregarded. *See Eason*, 416 F. App'x at 570; *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 643–44 (7th Cir. 2008). That said, the Court still considered some of the underlying evidence referenced by Myvett, as noted below by citations to the raw record materials. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

## II. Myvett's Discriminatory-Discharge Claim

The Court turns to Myvett's claim that Kraft Heinz discriminated against her on the basis of her disability when it fired her in June 2017. "In order to defeat summary judgment on her disability discrimination claim, [Myvett] must point to evidence capable of establishing that (1) she is a person with a disability within the meaning of the ADA . . .; (2) she is qualified to perform the essential functions of her job with or without a reasonable accommodation; and (3) she suffered from an

adverse employment decision as a result of her disability." *Guzman v. Brown County*, 884 F.3d 633, 641 (7th Cir. 2018).

Kraft Heinz does not dispute that Myvett was a qualified individual with a disability. Instead, the company argues that Myvett was fired because of her performance deficiencies rather than her disability. In support, Kraft Heinz invokes the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and contends that Myvett cannot establish that she was meeting its legitimate employment expectations or that she was treated worse than any non-disabled comparator. *See* Mem. in Supp. of Summ. J. at 4–10; *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) (noting that, under the *McDonnell Douglas* framework, "[t]o establish a prima facie case of discrimination a plaintiff must offer evidence that: '(1) she is a member of a protected class, (2) her job performance met [the employer's] legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorable than the plaintiff.'" (citation omitted)).

But *McDonnell Douglas* is only one approach to answering the ultimate question of whether there is evidence that "would permit a reasonable factfinder to conclude that [her disability] . . . caused the discharge." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). That is, even assuming that Myvett was a substandard employee who cannot readily point to a similarly-situated co-worker who was treated more favorably, she can survive summary judgment on her unlawful-discharge claim if there is evidence in the record that would permit a

reasonable juror to conclude that her disability was the but-for cause of her firing. *See Knapp v. Evgeros, Inc.*, 205 F. Supp. 3d 946, 957–58 (N.D. Ill. 2016) ("*McDonnell Douglas* is just one way that the record evidence could enable a reasonable juror to find discrimination.").

The record contains such evidence. The record suggests that Harlem, de Sousa, and Aliberti—the three individuals who together decided to fire Myvett, *see* DSOF ¶ 63—communicated about Myvett's performance issues for the first time within minutes after Harlem had become aware of Myvett's lifting restriction. Specifically, Harlem emailed de Sousa, Aliberti, and Pearl Patel at 10:53 p.m. on May 24, 2017—with a subject line of "Ashley Liddell Myvett Accommodation request"—stating that he had just became aware ("in the last [five] minutes") of Myvett's lifting restriction. Harlem Dep. Ex. 16 at 1. He expressed concern that there was "not an end in [sight]" for the restriction and that it would make "much of our merchandising impossible for [Myvett] to complete." *Id.*

Harlem's email then proceeded to ask if the company would be able to accommodate Myvett's restriction, adding that even if she could be accommodated, "how do we handle our merchandising commitments that we made our retail teams for her stores?" *Id.* Only after noting these concerns did Harlem add that "[Myvett] has been a problem ISP, with poor communication, and earlier this week committed a major offense." *Id.*

Within ten minutes of sending that message, Harlem again emailed de Sousa, Aliberti, and Patel, stating that he wanted to issue a warning letter to Myvett about

7

forgetting to bring her iPad to work two days earlier. Harlem Dep. Ex. 21 at 2. Aliberti responded the following morning and asked whether a Performance Improvement Plan ("PIP") grid had been filled out for Myvett yet, writing that "[w]e want to document all of the performance issues . . . (do we have other examples of when she did not bring the tablet)? What other performance issues is she having?" *Id.* Aliberti finished the email by asking Patel whether "any additional accommodation requests from [Myvett had] come through." *Id.* And, as Kraft Heinz acknowledges, Harlem's late-night emails on May 24 prompted Aliberti to conduct an investigation into Myvett's performance which ultimately led to her termination. DSOF ¶¶ 53, 61.

The timing and content of these communications would allow a reasonable juror to conclude that the decisionmakers' awareness of Myvett's lifting restriction set in motion the events that led to her termination. *See Lang v. Illinois Dept. of Children and Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004) ("[T]he timing of events 'is often an important evidentiary ally of the plaintiff.'" (quoting *Lalvani v. Cook County*, 260 F.3d 785, 790 (7th Cir. 2001))). Not only did the relevant actors initiate an investigation into Myvett's performance almost immediately after becoming aware of her lifting restriction, but they also indicated substantial concern about that restriction and its ramifications in their contemporaneous emails. *See id.* ("Close temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is also other evidence that supports the inference of a causal link." (citation omitted)).

8

The record also contains other evidence casting doubt on the contention that Myvett's firing was unrelated to her disability. For instance, the PIP created at the direction of Aliberti includes an entry noting that Myvett had an upcoming doctor's appointment on June 1, 2017, and that she "can only lift under [10 lbs] and has limited [ability to] driv[e] should she experience pain." Defs.' Ex. J, Rodriguez Decl. Ex. D at 1, ECF No. 66–10. Under the field "ISP Competency at Risk," this entry states "Cannot perform ISP duties." *Id.*

Moreover, Kraft Heinz justifies the firing in part by noting that Rodriguez had told Harlem in March 2017 that Myvett "had a negative attitude," and "did not take well to coaching," Mem. in Supp. of Summ. J. at 6, but the record indicates that these behavioral issues may been resolved by the time Myvett was fired. Specifically, Rodriguez has testified that she "counseled [] Myvett" about these deficiencies and that "by the beginning of June 2017"—shortly before Myvett was fired—Rodriguez's "opinion was that [Myvett] was making progress and had a lot of potential." Def.'s Ex. E, Rodriguez Decl. at 1–2, ECF No. 66-5. Furthermore, although Kraft Heinz stresses that Chicago South was the "absolute most critical" territory in the LEGO division, DSOF ¶ 10—and thus Myvett's performance deficiencies were "particularly disconcerting," Mem. in Supp. of Summ. J. at 1—there is evidence that Chicago South went without an ISP for "a few months" after Myvett's immediate successor was transferred to a different territory. Def.'s Ex. F, Bright Decl. ¶ 7, ECF No. 66-6.

9

In sum, the Court concludes that the record contains evidence enabling a reasonable jury to conclude that Myvett was fired on the basis of her disability. It is worth noting that Myvett need only show that her disability was *a* but-for cause of her firing; the disability need not be the *only* but-for cause of her firing. *See Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 963 (7th Cir. 2010); *Knapp*, 205 F. Supp. 3d at 959. So perhaps, as Kraft Heinz repeatedly protests, Myvett's performance deficiencies were a but-for cause of her firing. That is, perhaps Myvett, notwithstanding her disability, would not have been fired had she been a better employee. But because there is evidence in the record from which a reasonable juror could conclude that, notwithstanding her performance deficiencies, Myvett would not have been fired but-for her disability—and specifically, that it was her disability that triggered the process that led to her eventual termination—summary judgment is not appropriate as to Myvett's discriminatory-discharge claim. *Cf. Nigh v. School Dist. of Mellen*, 50 F. Supp. 3d 1034, 1056 (W.D. Wis. 2014) ("'[A] single event can have multiple but-for causes,' and given the evidence [Plaintiff] has adduced to support her retaliation claim, a reasonably jury might find that the Board would [have renewed her] contract but for her FMLA leave—even if . . . her performance deficiencies played just as great a role in the Board's decision." (citation omitted)).

### III. Myvett's Failure-to-Accommodate Claim

The Court, however, grants summary judgment as to Myvett's failure-to-accommodate claim. Myvett does not dispute that she did not request an accommodation before she was terminated—even though Kraft Heinz gave her the

10

opportunity to make such a request—DSOF ¶ 31, and "the standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches," *James v. Hyatt Regency Chi.*, 707 F.3d 775, 782 (7th Cir. 2013) (quoting *Jovanovic v. Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000)).

Myvett contends that her decision to not submit an accommodation request had "little to do" with her own view of whether she needed an accommodation to complete the essential functions of her job, and almost all to do with the fact that the request paperwork was accompanied with the caveat, "[y]ou do not **need** to fill out [the accommodation forms] if you do not wish to," Defs.' Ex. B, Myvett Dep. Ex. 19 (boldface font in the original). *See* Mem. in Opp. to Summ. J. at 14. But this caveat is of limited legal significance; it is fairly innocuous boilerplate that reasonably connotes no more than that an employee will not be punished *solely* because they fail to fill out an accommodation request form. Moreover, the Court notes that Myvett's explanation for why she failed to fill out an accommodation request is inconsistent with the explanation provided in her deposition. *See* Myvett Dep. at 231:14–22 (stating that she did not fill out a request form because "I did not need reasonable accommodations because I was able to do the essential job functions that were required of me.").

More broadly, Myvett argues that Kraft Heinz should have consulted further with her before it determined that her disability precluded her from sufficiently performing her job. *See* Mem. in Opp. to Summ. J. at 14–15 (faulting Kraft Heinz for concluding on its own that she "[could not] do her job because of her disability");

11

*id.* at 15 (stating that Kraft Heinz, notwithstanding their offer for her to request accommodations, should have "notifi[ed] her of its concerns regarding her disability"). At bottom, though, Myvett alleges here that she could have performed the essential functions of her job with or without reasonable accommodations, that Kraft Heinz erred when it determined otherwise, and that the company thus violated the ADA when it fired her. This is essentially a restatement of her discriminatory-discharge claim. And thus, while that claim will go forward, *see supra*, summary judgment is granted in favor of Kraft Heinz as to Myvett's failure-to-accommodate claim.

## **Conclusion**

For the foregoing reasons, Kraft Heinz's motion for summary judgment is granted in part and denied in part. Myvett's discriminatory-discharge claim will go forward, but her failure-to-accommodate claim will not.

ENTERED: 3/16/20

_John Z. Lee_
_____
John Z. Lee
United States District Court Judge